# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-183V**

| | |
|---|---|
| AIMAN AL-HIYARI,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 27, 2026 |

*Matthew F. Belanger, Faraci Lange LLP, Rochester, NY, for Petitioner.*

*Joseph Douglas Leavitt, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On February 9, 2023, Aiman Al-Hiyari filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of a flu vaccine received on November 14, 2020, he suffered Guillain-Barré syndrome ("GBS") as listed on the Vaccine Injury Table ("the Table"). Petition, ECF No. 1 at 1; 42 C.F.R. §§ 100.3(a)(XIV)(D), (c)(15). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent conceded entitlement, but the parties have requested my formal adjudication of damages.[3] **I hereby award $5,229.19 for reimbursement of a Medicaid lien (as stipulated); $19,735.84 for past lost earnings up to July 2021 (as stipulated; but not beyond that point, and not including payments related to a commercial lease); and $185,000.00 for past pain and suffering.**

## I. Lost Earnings

### A. Legal Standard

The Vaccine Act provides that "[i]n the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." Section 15(a)(3)(A).

Lost earnings determinations must be made in a "cautious manner." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073 at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). These determinations may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015). Indeed, the Court of Federal Claims has recently stated that a lost earnings determination following the statutory mandate of "'generally recognized actuarial principles and projections' w[ill] likely require expert opinion evidence." *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020), citing *Dunmiles v. Jubilee Towing, LLC,* No. CV 16-14325, 2017 WL 1212091, at *4 (E.D. La. Apr. 3, 2017) (explaining that typically, "vocational rehabilitation experts… advise… as to the income a plaintiff can probably earn," and "economists then use that information in conjunction with actuarial data to estimate the wage loss the plaintiff will probably sustain"); *Brown*, 2005 WL 2659073 at *1-2, 7 (involving testimony from vocational and economic experts, and fact witnesses); and *Petronelli v. Sec'y of Health & Hum. Servs.*, No. 12-285V, 2016 WL 1085455 at *2 (Fed. Cl. Spec. Mstr. Feb. 22, 2016) (involving similar expert testimony).

---

[3] *See* Joint Status Report dated July 9, 2024, ECF No. 29; Petitioner's Motion for Ruling on the Record dated Feb. 22, 2025, ECF No. 38 (hereinafter "Brief"); Respondent's Response dated Mar. 14, 2025, ECF No. 41; Petitioner's Reply dated Mar. 20, 2025, ECF No. 42. The parties later confirmed a Medicaid lien amount and other reimbursement details. Brief at 3, citing Ex. 17; Response at 6; Joint Status Report dated July 6, 2026, ECF No. 45 (confirming final lien amount and recipient details). The matter is now ripe for adjudication.

The statute requires a petitioner to demonstrate actually "impaired" earning capacity. Section 15(a)(3)(A); *Brown*, 2005 WL 2659073 at *7 (concluding that the petitioner suffered "diminished capacity" and "would have earned more in the ensuring years but for" his GBS); *Petronelli*, 2016 WL 1085455 at *1, 2 (finding that due to her GBS, the petitioner was "completely disabled from professional employment as an attorney or other competitive employment," "on either a part-time or full-time basis"); *Jimenez v. Sec'y of Health & Hum. Servs.*, No. 17-1190V, 2026 WL 1589778, at *20, 22 (Fed. Cl. Spec. Mstr. May 6, 2026) (emphasizing "whether a petitioner's earning capacity is or has been impaired due to his vaccine injury… is a threshold issue").[4] *Compare Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047 at *10 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (finding insufficient evidence of a vaccine injury, or any resulting medical treatment or activity restrictions, that would have prevented the petitioner from "accomplish[ing] her work-related tasks during the relevant time period, or only at a far lower level"); *Laurette v. Sec'y of Health & Hum. Servs.*, No. 19-1047V, 2024 WL 1741611, at *8-9 (Fed. Cl. Spec. Mstr. Mar. 25, 2024) (finding it "wholly unclear" that the petitioner's vaccine injury prevented his prior employment or any alternative employment); *Warnock v. Sec'y of Health & Hum. Servs.*, No. 20-956V, 2026 WL 1430953, at *16 (Fed. Cl. Spec. Mstr. Apr. 20, 2026) (concluding that the petitioner had "failed to provide evidence establishing that her 'earning capacity is or has been impaired by reason of… [her] vaccine injury' as required by Section 15(a)(3)(A)").

## B. The Parties' Positions

At the time of his GBS onset, Petitioner was employed as the sole operator/employee of a "typical urban convenience store selling groceries, newspapers and magazines, snacks, and other common household items." Brief at 4; Ex. 9 at ¶ 4. The parties stipulate that Petitioner's average weekly wage after tax was $636.64; they only disagree, in their words, about the appropriate "duration of lost wages" that should be awarded. Brief at 3; Response at 6. Their dispute is essentially the duration and extent of Petitioner's impaired earning *capacity* under Section 15(a)(3)(A).

In seeking a lost earnings award of $58,782.12, Petitioner contends that he was wholly incapable of working from the date of his admission to the hospital for GBS (November 30, 2020) until the end of 2022, when he made a small amount of money as a DoorDash driver and substitute math teacher. Brief at 3. He recognizes those earnings

[4] In *Jimenez*, Special Master Dorsey evaluated whether a vaccine injury sustained at fifteen (15) years old was sufficiently severe to support a finding of adult lost earnings capacity, under Section 15(a)(3)(B). However, the key statutory language ("…earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded…") also appears in Section 15(a)(3)(A), concerning adult vaccine injuries, at issue in this case.

must offset the lost earnings claim, which runs to December 31, 2022. *Id.* Starting in 2023, Petitioner began working full-time as a math teacher, and income from that job equals or exceeds what he previously earned running the convenience store. *Id.* at 5; Ex. 9 at ¶ 11.[5]

In contrast, Respondent supports awarding $19,735.84 for Petitioner's impaired earning capacity – calculating that sum from November 30, 2020 – July 1, 2021, as the "acute phase" of his GBS. Response at 10. Respondent contends there is insufficient evidence of *continued* impaired earning capacity after the July 2021 end of formal PT. *Id.* at 8.[6] In part, Respondent argues that Petitioner had "essentially the same" symptoms, pain, and physical limitations at neurology follow-up on July 22, 2021, as on May 1, 2023, nearly two years later. Response at 9, citing Brief at 15-16; Ex. 7 at 7-11; Ex. 16 at 8-11). Thus, "given that Petitioner's earning capacity was not impaired in 2023 [when he was working full-time as a math teacher], it [his earning capacity] could not have been impaired from July of 2021 through the end of 2022." Response at 9.

In his Reply, Petitioner maintains that there is "extensive and unrebutted medical evidence" that as of July 2021, he was not fully recovered from GBS – still experiencing pain, weakness, and balance difficulties particularly in his legs – requiring a walker to ambulate, with additional symptoms in his hands and face. Reply at 2-4. Petitioner contends there is "overwhelming evidence supporting [his] claim that he was still unable to work after July 1, 2021, and no evidence in this record to support Respondent's claim that Petitioner could work at the store or in any other job as of that date." *Id.* at 4. However, Petitioner does not address his apparent self-discharge from PT in July 2021; does not compare his condition in mid-2021 to that in 2023, or explain whether he was capable of some employment options such as his eventual full-time math teacher position earlier in time.

### C. Analysis

The parties have stipulated to Petitioner's pre-GBS earnings, and that his GBS completely impaired his earning capacity until at least July 2021. I will not disturb the parties' agreement on those points, and agree that Petitioner's acute phase of GBS (involving an initial hospitalization with treatment including IVIg; inpatient rehabilitation; and formal therapies first at home, and then at an outpatient facility) was sufficiently

[5] Petitioner's statements at Exs. 1, 9 are made under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a statement may be given like force and effect as an affidavit).

[6] Petitioner's sixth and last formal PT session was actually on July *6*, 2021. Ex. 6 at 30-31. He cancelled or failed to appear for several subsequent PT sessions, leading to his administrative discharge as of August 12, 2021. *Id.* at 30.

alarming, physically debilitating, and time-intensive to have completely prevented him from working through July 2021.[7] Despite his apparent, unexplained self-discharge from formal PT after July 6, 2021, Petitioner was documented at that time to have ongoing GBS residuals particularly in his legs, requiring a walker for ambulation. He had persistent neuropathic pain, managed with prescription gabapentin. *See e.g.*, Ex. 6 at 30-31. He was also diagnosed with new, post-GBS depression prompting a July 1, 2021 neuropsychology consult (Ex. 7 at 25-26, and subsequent use of Wellbutrin (first prescribed in May 2021, Ex. 4 at 9, and increased in June 2021, *id.* at 68) and Zoloft (added on July 22, 2021, Ex. 7 at 7).

Petitioner asserts that these GBS residuals made him physically unable to resume working at the convenience store. Ex.1 at ¶¶ 16, 18; Ex. 9 at ¶¶ 5, 22. This assertion seems reasonable (at least with respect to full-time labor),[8] and is somewhat supported by notations in the medical records. *See e.g.,*, Ex. 4 at 38-41 (primary care record reflecting that Petitioner's work duties included lifting heavy items such as cases of water); Ex. 3 at 32, 47, 62, 140, 149 (November 2020 hospital records reflecting that Petitioner initially believed that he was suffering "muscle aches" from being on his feet up to 11-12 hours each day at work). And he may also have been precluded from certain physically-demanding work, such as food delivery.[9]

Petitioner has not, however, demonstrated complete impairment and inability to perform any work for the remainder of 2021 through 2022. The most obvious option would have been teaching – the very position he eventually obtained. Of note, Petitioner had earned a bachelor's degree in mathematics from California State University in *1996*. Ex.

---

[7] Because this matter was assigned to SPU, a standard instruction was issued holding that no expert should be retained without my authorization and consultation with Respondent. ECF Nos. 11, 19. This was not a *prohibition* against experts – which have been authorized in the SPU context, especially if a case is formally in the damages phase. *See e.g.*, *Warnock*, 2026 WL 1430953 at *1-2, 14-16. But no expert input was ultimately sought.

[8] Petitioner *may* have been capable of working at the convenience store in a reduced capacity – e.g., "engag[ing] in activities that did not require independent ambulation, such as bookkeeping, running the case register, ordering supplies, etc.," Response at 8, even if that entailed hiring someone else for the more physically demanding tasks. Petitioner has not explained why he could not have modified his role at the convenience store, therefore resulting in only *partially* impaired earning capacity, for some period of time. Petitioner states that his wife and adult children temporarily tried to maintain the store. Ex. 9 at ¶¶ 3, 5-6. But "[w]ith [Petitioner] unable to work and with nobody else able to run the store, we stopped opening in 2021 and eventually closed the store permanently in 2022." *Id.* at ¶ 6. But he does not address the potential of formally hiring anyone, outside of his family, to work at the convenience store after the start of his debilitating symptoms – even though he admits to having done so beforehand. *Id.* at ¶ 5 ("over the years we occasionally hired part-time employees or family members to help…").

[9] Petitioner states: "In 2022, I needed to try to do something to earn some income… I tried to work as a DoorDash driver but was physically unable to do so. I made $1,952.00 from DoorDash in 2022." Ex. 9 at ¶ 10.

9 at ¶ 2. He has not addressed why he only started working as a substitute math teacher “later in 2022,” and then became a full-time math teacher in 2023. Ex. 9 at ¶¶ 10-11; *see also id.* at ¶ 23 (acknowledging that GBS residuals, including lower extremity pain and weakness, decreased balance, and facial paralysis “d[o] not prevent me from teaching, so I can at least earn a living”).

Moreover, even if Petitioner had substantiated that it took some time to transition to a new field of work, and/or complete some certifications or other paperwork to become employed in the public schools,[10] that would not necessarily mean that he was unable to work as a teacher in 2021 and 2022 *as a result of his GBS*. On this question, Respondent persuasively argued that Petitioner’s GBS residuals were *unchanged* from July 2021, throughout 2022, and into 2023 when he began working full-time as a math teacher. Response at 9 (citing Brief at 15-16; Ex. 7 at 7-11; Ex. 16 at 8-11). Even in his Reply, Petitioner did not demonstrate that his GBS residuals changed in any meaningful sense, making him newly capable of working as a math teacher, only in late 2022 or 2023.

Section 15(a)(3)(A)’s allowance of lost earnings as a damages component should be applied in a cautious manner, including with regard to Petitioner’s assertion of *continued* lost earning capacity. Here, that continued inability to work has not been preponderantly established. I therefore do not find continued lost earning capacity, as required for a continued lost earnings award, beyond what has been stipulated by the parties, and the sum they agreed reflects that temporary lost capacity ($19,735.84).

## II. Commercial Lease Expenses

Petitioner contends that as a result of his GBS, he was unable to maintain the commercial lease for his convenience store – resulting in a debt, interest, and penalties totaling $11,333.72. Brief at 6, citing Exs. 9, 12, 13; *see also* Ex. A, ECF No. 41-2 at 3 (reflecting that the missed lease payments began in October 2021); *id.* at 7 (lease agreement reflecting an initial term running to January 2024). He thus demands this amount as an element of lost earnings damages. *Id.* Petitioner agrees, however, that this request is “unique” and that he was “unable to find a similar case in the reported decisions under the Vaccine Act” in which a claimant received this damages component. *Id;* Reply at 8.

In opposition, Respondent argues that the convenience store’s closure may have been at least partially explained by unrelated circumstances. Response at 11 (maintaining that the COVID-19 Pandemic caused persistent supply chain issues and decreased foot

[10] Of note, Section 15(a)(1)(A)(iii)(II) authorizes compensation for actual unreimbursable expenses for certain “vocational training and placement” resulting from a compensated vaccine injury.

traffic for in-person local businesses, and citing Ex. A (reflecting that Petitioner began missing the commercial lease payments in October 2021)).

I have previously declined to award small business losses that were insufficiently tied to the vaccine injury, "as opposed to the negative business impacts of the Pandemic or simply market vagaries." *Anglewicz v. Sec'y of Health & Hum. Servs.*, No. 20-1504V, 2024 WL 2702415 at *13 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *see also Cirello v. Sec'y of Health & Hum. Servs.*, No. 23-478V, 2026 WL 593493 at *9 (Fed. Cl. Spec. Mstr. Jan. 30, 2026) (declining to award a petitioner's small business's decreased sales revenue, without "sufficient objective proof that would corroborate his contention that the decrease in revenue was a direct result of Petitioner's vaccine-related injury, all other things being equal"); *id.* at n. 12 (noting that the vaccination, resulting GBS, and decreased business revenue all occurred in 2022). The same outcome is dictated here. Despite Mr. Al-Hiyari's GBS residuals persisting from 2021-23, which understandably made it more difficult to singlehandedly operate the convenience store, he has not preponderantly demonstrated that his GBS solely or substantially caused the store's closure and the related debt.

Although I do not find a sufficient basis to award Petitioner's claimed additional "direct" lost earnings and the commercial lease expenses, those matters *will* be credited in calculation of the award for his past pain and suffering.

## III. Pain and Suffering

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical

formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

**B. Prior SPU Compensation of GBS Pain and Suffering**

**1. General Data Regarding Compensation in SPU Flu/ GBS Cases**

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of July 1, 2026, 1,055 GBS cases have been resolved since SPU's inception ten years ago. Compensation has been awarded in the vast majority of cases (1,003), with the remaining 52 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[11] Agreement |
|---|---|---|---|---|
| **Total Cases** | *81* | *504* | *25* | *393* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $145,196.33 | $125,334.72 | $135,000.00 | $100,000.00 |
| **Median** | **$166,700.04** | **$165,917.44** | **$196,794.54** | **$149,463.32** |
| **3rd Quartile** | $185,209.45 | $241,649.97 | $373,371.11 | $210,993.03 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

### 2. Adjudication of Pain and Suffering in GBS Cases

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[12]

As of July 1, 2026, on nearly every occasion that SPU has had to resolve the appropriate award for GBS-associated pain and suffering, over $100,000.00 has been awarded (with a lower sum, $92,500.00, only awarded once). The remaining eighty (80) awards far exceeded $100,000.00. The first-quartile value is $140,000.00. The median is $160,000.00. The third-quartile value is $175,000.00. The largest award was $225,000.00.[13]

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 - 42 days (not less than 3 days,

[11] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[12] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[13] The $225,000.00 award reflected particularly unique and severe "pain and suffering [the vaccinee] experienced as a result of his GBS leading up to and including his death." *Janni ex rel. Janni v. Sec'y of Health & Hum. Servs.*, No. 22-285V, 2025 WL 1984084 at *7 (Fed. Cl. Spec. Mstr. June 16, 2025).

and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I). The three most common subtypes are acute inflammatory demyelinating polyneuropathy; acute motor axonal neuropathy; and acute motor and sensory neuropathy. *Id.* The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." *Id.* at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[14]

A consistent starting consideration in determining pain and suffering awards in the context of a GBS injury is that the amounts should exceed "those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[15] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

---

[14] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[15] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

In addition, "[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). But a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence often *supplements* the record evidence, and/or corroborates important fact contentions.

### C. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases, and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The record establishes that at the time of vaccination and subsequent GBS onset (in November 2020), Petitioner was 64 years old, healthy with no relevant medical conditions, and working full-time as the owner/ sole operator of a convenience store. *See e.g.*, Response at 2; Ex. 4 at 38-41; Ex. 3 at 46. His GBS was moderately severe. He experienced fairly typical neurological symptoms (pain, tingling, weakness, decreased coordination) in all four extremities, as well as less typical facial involvement (affecting his vision, facial expressions, speech, and eating). He was transported by ambulance to the emergency room, and GBS was suspected fairly quickly. His 11-day hospitalization (from November 30 – December 11, 2020) included a lumbar puncture; a five-day course of IVIg; gabapentin for neuropathic pain; interventions for his difficulty sleeping; a soft-food diet; and the start of physical, occupational, and speech language pathology therapies. *See e.g.*, Ex. 3 at 57-61 (hospital discharge summary).[16] Also of note during the initial inpatient hospitalization, Petitioner was isolated, without any visitors allowed, because his son had tested positive for COVID. Ex. 3 at 58-59, 84, 109, 124.

The 33-day inpatient rehabilitation course (from December 11, 2020 to January 15, 2021) involved intensive therapies, and limited references to neuropsychology services – supporting the new, post-GBS onset of depression and potentially also memory loss. *See e.g.*, Ex. 5 at 50-52, 75. Petitioner continued eating a soft diet, and taking gabapentin for pain. *Id.* at 54. He also received a topical pain reliever; antibiotics and "artificial tear" eyedrops for his GBS-related eye symptoms; prescription sleep aids;

[16] On December 4, 2020, Petitioner was moved into the hospital's intensive nursing care unit due to his swallowing difficulties and *possible* respiratory decline, which fortunately did not progress any further. *See e.g.*, Ex. 3 at 135; Brief at 18 (agreeing that Petitioner "avoided severe respiratory consequences"). Petitioner also suggested that he experienced incontinence during his hospitalization, Brief at 9, but then conceded that he "did not experience the same bladder and bowel difficulties as the claimant in *Fiumara*," *id.* at 18.

and an eye mask. *Id.* at 53-54, 76, 118, 140. The January 15, 2021 discharge summary provides that Petitioner had fully complied with his inpatient therapies and motivated to improve further. *Id.* at 53-57.

After returning home in mid-January 2021, Petitioner continued to experience meaningful GBS residuals – particularly neuropathic pain, weakness, and balance issues in his legs, causing reliance on his family members, and a walker to ambulate even around his home. To decrease his potential exposure to COVID-19, he initially received home health services (specifically five skilled nursing sessions; 11 occupational therapy sessions; 18 speech language pathology sessions; and 28 physical therapy sessions) between January – May 2021, *see generally* Ex. 8. Those were followed by two outpatient speech language pathology sessions on June 10 and 24, 2021, and six outpatient PT sessions from June 10 – July 6, 2021, *see generally* Ex. 6. But the available evidence suggests that by early July 2021, Petitioner felt somewhat improved and opted to taper down his active treatment. *See e.g.*, Ex. 6 at 31 (July 6, 2021 – final PT session at which Petitioner reported 0/10 pain; increased confidence ambulating with a cane; and feeling more stable in general); *id.* at 26 (reflecting that his health insurance authorized additional PT); *id.* at 30 (August 12, 2021 addendum to the PT records, entering an administrative discharge because Petitioner had repeatedly “cancelled and/or no-showed remaining physical therapy appointments and made no attempt to reschedule”).[17] Also of note, Petitioner did not follow up after just one neuropsychology consult on July 22, 2021, Ex. 7 at 25-26.

The subsequent, intermittent medical appointments suggest that Petitioner’s GBS residuals (e.g., neuropathic pain, decreased mobility, and depression) remained about the same, but they were also manageable with prescription medication, to at least mid-2022.[18] Then after a lengthy gap (and filing of the Vaccine Act petition), on May 1, 2023, Petitioner returned to his neurologist, reporting ongoing “slow” ambulation and reliance on a walker, and persistent leg pain. Ex. 16 at 8. The neurologist suggested an increased

---

[17] Petitioner emphasizes *earlier* outpatient PT records which note he had fallen and experienced a reduction in balance-related confidence. Brief at 14, citing Ex. 6 at 7, 39. Petitioner does not address his apparent improvement with formal PT, and apparent self-discharge from those sessions. Brief at 14.

[18] *See* Ex. 7 at 39-43 (January 28, 2021 outpatient neurology record, noting prescription for gabapentin 300 mg three times daily); Ex. 4 at 7-10 (May 11, 2021 primary care record, and new prescriptions for Wellbutrin 150mg daily as well as Cialis); Ex. 4 at 66-68 (June 10, 2021 primary care record, with Wellbutrin prescription increased to 300mg daily); Ex. 7 at 7-11 (July 22, 2021 neurology record noting Petitioner’s frustration with his slow recovery and a new prescription for another antidepressant, Zoloft 25mg, but not mentioning his other medications); Ex. 4 at 62-64 (August 16, 2021 primary care record documenting only “intermittent” knee pain, and “hel[p]” from the antidepressants); Ex. 7 at 53-56 (November 17, 2021 neurology record documenting “well controlled” neuropathic pain and “stable mood” with his antidepressants); Ex. 4 at 59-61 (June 9, 2022 primary care record reflecting no significant change in Petitioner’s condition, and the same ongoing medications).

dose of gabapentin (from 300mg to 400mg, but still up to three times daily). *Id.* Petitioner's eyelid symptoms were improved and did not warrant surgical intervention, and his depression remained stable with Wellbutrin and Zoloft. *Id.* Petitioner was encouraged to return to the neurologist in another six months, but no further medical records have been filed. In adjudicating pain and suffering, I have also considered Petitioner's written testimony, Exs. 1, 9.

Overall, Petitioner has established that his GBS was moderately severe for *at least* eight months, or until July 2021 – coinciding with the end of formal PT. He is documented to have experienced some degree of GBS residuals for approximately two more years – to May 2023, but these appear fairly typical for the disease, and here apparently manageable with prescription medication based on the lack of ongoing medical treatment with no obvious barriers to care or other explanation (except for Petitioner's apparent frustration with his slow recovery) and his resumed employment part-time in 2022, then full-time in early 2023.

I also note that Petitioner's GBS likely prevented him from resuming his full-time, sole operation of his convenience store. It is likely that his GBS symptoms partially informed his decision to close the store sometime in 2021, resulting in missed payments and legal difficulties regarding early termination of the commercial lease; and other financial stress and a lack of stable income until the end of 2022 or early 2023. These impacts are adequately documented to justify an upward adjustment in the pain and suffering award (even while Petitioner's *lost earnings* demand is insufficiently developed, under that distinct legal standard).

Turning to the parties' damages positions, Respondent suggests awarding no more than $142,500.00 for past pain and suffering. Response at 13. He accurately recounts many of the pertinent facts, but appears to skip over Petitioner's initial *home-based* outpatient rehabilitation. Response at 4, 13; *but see* Ex. 6 (home health records). Petitioner actually completed over 60 outpatient therapy sessions over roughly five months, concluding at about eight months post-vaccination and GBS onset.

Moreover, Respondent has not persuasively supported his valuation with comparable cases. He suggests that Petitioner should receive just "slightly more" ($2,500.00) than the petitioner in *Weil.*[19] Response at 13-14. But I agree that a higher award has multiple justifications here – including neurological symptoms extending to his face and eyes; meaningfully longer hospitalization (11 versus 4 days) and inpatient

[19] Citing *Weil v. Sec'y of Health & Hum. Servs.*, No. 21-0831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) ($140,000.00).

rehabilitation (33 versus 20 days); more extensive outpatient therapies (60-plus sessions over five months, versus just seven sessions in one month); and longer residuals (over eight months, compared to Mr. Weil being "nearly at baseline" at approximately 2.5 months post-vaccination. Reply at 6. Moreover, my opinion in *Weil* did not recognize any professional impacts akin to this Petitioner's difficulty maintaining his convenience store and shift to another (albeit eventually equivalent) line of work.[20]

Petitioner reasonably sought more than the proffered amount – but his $200,000.00 demand is also somewhat too high. Brief at 7. I have explained in other decisions that such an award is not typically appropriate for a GBS case with a "substantial" or "good" recovery overall, even if the claimant is experiencing the kind of ongoing sequelae common to GBS. *Infra* Section III.B, citing *Elenteny*, 2023 WL 2447498, at *5, and *Miller*, 2023 WL 2474322, at *8. Petitioner's residual symptoms, even including the ongoing use of assistive devices and prescription pain and antidepressant medications, seem somewhat typical for GBS – and must be weighed alongside the somewhat limited evidence submitted in this case. Petitioner's ongoing pain levels are not documented, but his ongoing gabapentin prescription indicates that he has not continued to suffer as much as the *Fiumara*[21] petitioner – who returned to PT and attempted additional pain measures (beyond gabapentin) including amitriptyline; capsaicin cream; a functional restoration program; a diagnostic medial branch block; and radiofrequency ablation over approximately *five years* (compared to just three years of medical record documentation in this case). 2024 WL 4930694 at *5. I also relied on "case-specific evidence, particularly the highly qualified treating physicians' opinions that Mr. Fiumara's long-term pain was multifactorial, but nonetheless partially explained by his GBS." *Id.* at *6.[22]

**Based on the evidence, arguments, and case comparisons submitted by both sides, I find that a fair and appropriate past pain and suffering award in this case is $185,000.00.**[23]

---

[20] For similar reasons, this case also warrants a higher pain and suffering award than Respondent's other cited case. Response at 14-15 and *Weil*, 2023 WL 1778281 at *6, citing *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) ($125,000.00).

[21] *Fiumara v. Sec'y of Health & Hum. Servs.*, No. 23-138V, 2024 WL 4930694 (Fed. Cl. Spec. Mstr. Oct. 30, 2024) (awarding $197,500.00 for past pain and suffering), cited in Brief at 17.

[22] Moreover, Mr. Fiumara's GBS "was at least a substantial factor explaining his decision not to return to [certain activities including…] work in construction and farming." 2024 WL 4930694 at *5. That is somewhat equivalent to the recognition of professional disruptions in this case (involving Mr. Al-Hiyari's difficulties resuming operation of his convenience store, and transitioning to teaching).

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-

## Conclusion

Based on the record as a whole and arguments of the parties, **I award the following:**

**A. A lump sum payment of $5,229.19 (representing compensation for the satisfaction of the New York State Medicaid lien) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to:**

**New York State Department of Health**
**P.O. Box 415874**
**Boston, MA 02241-5874**

**B. A lump sum payment of $204,735.84 (representing $19,735.84 for past lost earnings and $185,000.00 for past pain and suffering) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[24]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.